CENTRAL OF GEORGIA RY. CO. v. PAUL.

(Circuit Court of Appeals, Fifth Circuit. April 18, 1899.)

No. 777.

1. CORPORATIONS—TRANSFER OF PROPERTY—RIGHTS OF CREDITORS.

Where a plan for reorganization is entered into by the stockholders and secured creditors of an insolvent corporation, and is carried out, pursuant to which all the property of the corporation is sold by foreclosure and otherwise, and transferred to the new corporation, whereby the stockholders of the old corporation retain their interest and rights, and by virtue thereof are either stockholders in the new corporation, or are otherwise provided for, this is a fraud on an unsecured creditor of the old corporation, so that she may hold the new corporation for her claim.

2. DECREE—AFFIRMANCE.

A decree rendered on intervention in liquidation proceedings, on full hearing, against one allowed to make full defense, having done full equity between the parties, will be affirmed, though intervener might more properly have filed a bill for the relief obtained.

Appeal from the Circuit Court of the United States for the Southern District of Georgia.

On March 4, 1892, Rowena Clark, a stockholder of the Central Railroad & Banking Company of Georgia, filed her bill in the circuit court, assailing the validity of a certain lease made by the Central of its entire railroad and property to the Georgia Pacific Railroad Company, under which lease the Richmond & Danville Railroad Company was then operating and controlling the same. She also assailed the legality of the control exercised over the Central by the Richmond & West Point Terminal Railway & Warehouse Company by means of a majority of shares of Central stock owned by it. The bill prayed for the cancellation of the lease; injunction against the continued use of the

said majority of stock; for an injunction and receiver. As detailed in the bill, the object of the same was to protect the Central and to preserve its autonomy. On this bill the court issued a temporary injunction, and appointed E. P. Alexander a temporary receiver, directing him to make no change in keeping the Central's books. On subsequent hearing, March 28, 1892, the court appointed receivers, with the usual powers granted to receivers of railroads; directing them to take and operate the property pending a reorganization of the board of directors of the Central, and generally providing for the maintenance of the Central System. On July 4, 1892, the Central filed its bill against the Farmers' Loan & Trust Company of New York City, the Central Trust Company of New York, and a number of railroad corporations, in which bill was set forth the proceedings in the Rowena Clark cause, above mentioned, a description and list of all the railroads, and assets and property of the Central, including its leasehold interest in other railroads. This bill averred that the Central is now insolvent, in the sense that it is unable to meet its maturing obligations, but that if the integrity of its system is maintained, and its properties and interests preserved, until a proper plan of reorganization can be effected, it can be re-established upon a sound basis, and restored to prosperous conditions; to accomplish which, however, the immediate interposition of a court of chancery is absolutely necessary, for the purpose of protecting the integrity of the system, and saving it from disintegration, and preventing the serious and irreparable losses that the disruption would entail upon the stockholders, creditors, and other persons interested in the property. The bill prayed that all of the property and assets of the Central be taken in charge by a receiver to be appointed by the court, to be administered as a trust fund for the stockholders and all interested; that the receivers first pay current expenses of maintaining and operating the Central, and steamship lines and other properties, and all labor, supplies, and rentals, and such other charges as are necessary to be made in order to prevent the forfeiture of the Central's rights and interests in the properties which constitute its said system, etc. Under this bill on July 15, 1892, the court discharged the receivers under the Rowena Clark bill, and appointed H. M. Comer sole receiver; and in and by this order the court directed that the receiver assume and pay all the liabilities and expenses incurred under the Rowena Clark receivership, take possession and charge and control of said corporations named in the bill, and other property and assets of every kind, and to operate the same, and to take possession, charge, and control of all the railroads and steamship lines, and railroads and steamships owned, leased, or otherwise controlled, operated by said Central Railroad & Banking Company, to manage and operate the same, etc., under the order and protection of the court, having and exercising all the rights and franchises belonging or appertaining to said corporations, to the end that the integrity of the Central Railroad System may be preserved. The order authorized the receiver, after defraying operating expenses, to pay out of the net earnings the rental and other fixed charges accruing to other companies, or resulting from the uses or operations of other lines and property as a part of said system; and all the corporations named in the bill were restrained and enjoined, pendente lite, from in any wise interfering with the receiver's possession.

After various pleadings not necessary to notice, on February 20, 1893, the Farmers' Loan & Trust Company, on leave of the court, filed its bill for foreclosure and for the appointment of a receiver, particularly making a party thereto the Central Trust Company of New York, as trustee of the second or consolidated mortgage bonds. This bill showed that the mortgage held by the Farmers' Loan & Trust Company covered all the railroads, and also all the property and assets of the Central Railroad & Banking Company of Georgia. It averred that the Central's auxiliary lines held under lease were a part of the property mortgaged, and all should be sold together. It recited the receivership under the bills of Rowena Clark and of the Central Railroad & Banking Company. It averred default of the Central, the inadequacy of the security, and then that "the mortgaged property and premises are so situated that they cannot, nor can any part thereof, be sold in parcels without great injury to the interests of the beneficiaries under your orator's trusts."

After other suitable allegations and prayers looking to a foreclosure and sale, the complainant prayed for a receiver, as follows: "Until such sale can be had, and the proceeds thereof distributed, your orator is likewise advised and charges that it is expedient and necessary that the franchises, property, premises, and appurtenances so mortgaged to your orator in trust as aforesaid, and all the rights, franchises, and property of the Central Company, of whatever name, nature, and description, including all its money on hand, and the earnings of the same, and all the rights, franchises, and property of the Southwestern Railroad Company of Georgia, of every kind and description, be placed in the hands and under the control of a receiver to be appointed herein by this court, with such proper powers as are right and equitable to be conferred; such receiver to be the same person appointed in like manner by the other courts having jurisdiction of portions of the mortgaged property, respectively." Upon this bill the court ordered that "Hugh M. Comer, the receiver of the court under the litigation now pending in said court, be made, and he is hereby appointed, temporary receiver under the above bill. This appointment is cumulative and supplementary to the orders heretofore made, and is not intended to vacate or affect any previous order." On May 1, 1893, the Central Trust Company of New York answered the bill of the Farmers' Loan & Trust Company, and, among other things therein, admitted as true the proceedings and orders of court as alleged in the bill, under which the leased property was taken possession of and operated by the receiver; but the Central Trust Company alleged that the court had no jurisdiction over the suits in which said orders were passed, but did not set out wherein the defective jurisdiction, if any, existed. The answer contained other matter, not necessary to recite. Some other bills and answers were filed, and many interventions, and there was much litigation; but on January 4, 1894, a consolidation having been previously ordered, a decree of foreclosure was rendered in favor of the Farmers' Loan & Trust Company on its mortgage and deed of trust, and leave was given to the Central Trust Company of New York to file a cross bill to foreclose its claim and mortgage on the Central's properties. This cross bill, subsequently filed and prosecuted, was brought in the interest of, and pursuant to, a new reorganization scheme, fully set out in the record.

On August 26, 1895, on the said cross bill and pleadings thereto, the court passed a final decree of foreclosure in favor of said Central Trust Company, which provided that in case of further default the said Central Railroad be sold in one parcel, without valuation, appraisement, redemption, or extension, and that of the price for which the property might be sold $50,000 should be paid in cash, and that upon the confirmation of same, and from time to time thereafter, such further portions of the purchase price should be paid in cash as the court should direct, in order to meet the expenses of foreclosure and sale, and allowed preferential claims; and, further, that upon confirmation of the sale the approved purchaser or purchasers should take the property purchased subject to the lien, if any, of all debts, obligations, and liabilities of the receivership "heretofore or hereafter to be lawfully incurred by or under the authority of the court, or arising under the operations of said railroad, and subject also to the lien of any and all claims heretofore filed in this cause, or in the causes consolidated herein, which the court has allowed or adjudged, or shall adjudge, to be prior in lien or superior in equity to said consolidated mortgages hereby foreclosed and ordered to be paid." Under this decree of foreclosure a sale was made to Samuel Thomas and Thomas F. Ryan, which sale was confirmed by the court October 17, 1895; the said decree of confirmation reciting that the sale was subject, however, to all the decrees, mortgages, liens, receivers' debts, and preferential claims, and to all the equities reserved, and to all and singular the conditions of purchase as recited in the final decree aforesaid, and the continued right of the court to adjudge and declare what receivers' or corporate debts were prior in lien or in equity to the lien of the consolidated mortgage foreclosed, or ought to be paid out of such proceeds and sale in preference to the bonds secured thereby; and the court expressly reserved for future adjudication, with the power thereby to bind the property sold, all liens and claims and equities specified and reserved by the final decree of foreclosure of August 26, 1895.

Following the foreclosure sale of the railroad property covered by the mortgage to the Central Trust Company, the Central Railroad & Banking Company of Georgia, and the receivers thereof, reported to the court that there were large assets and property belonging to the Central Railroad & Banking Company, which were not covered by the mortgages, and not appurtenant to the railroad. The petition recited as follows: "Third. The Central Railroad owns a considerable amount of property which cannot be covered under the general description of the railroad and the appurtenances thereof. For example, besides its railroad, it has for many years past been in the active operation of a bank, under its charter granted to it by the state of Georgia, and the assets of the banking department of said corporation are not appurtenant to the railroad. Fourth. There is a large amount of real estate, title to which is held by the Central Railroad, at various points along its line, and also on the lines of the Augusta & Savannah Railroad and the Southwestern Railroad, which it has operated for years under lease, and also on the lines of the Montgomery & Eufaula, the Savannah & Western, and the Port Royal & Augusta Railroads, which have been operated as a part of its system, title to which may not pass under the mortgage foreclosure hereinbefore referred to. Attached hereto, and marked 'Exhibit A,' is a description of certain lands which are either in whole or in part not actually used for railroad purposes, and about which doubts have been expressed as to their being covered or not by the mortgage, and as to the title thereof passing under the foreclosure sale. Complainant and the receivers are advised by counsel that many of the tracts of land set out in the said exhibit are covered by the mortgage, and that title thereto will pass under the foreclosure sale; but, in order to make sure of using all of the assets of the Central Railroad for the creation of a fund for the payment of its creditors and distribution among its stockholders, it has been thought best to make the said exhibit include all of the property therein described." And the prayer of the petition was that all the property described should be sold at public outcry. On this petition a decree was entered to the effect that the Central Railroad & Banking Company of Georgia was insolvent, unable to pay its just debts and liabilities, and directing the sale of all the remaining properties and assets of the company, called the "overflow property," to the end that the proceeds of the same might be distributed among the creditors of the company. Thereafter, on petition, Thomas and Ryan, purchasers of the railroad property, representing, among other things, that they were large creditors of the Central Railroad & Banking Company, reciting the amounts, and that they were practically the sole owners of the entire unsecured floating debt of the Central Railroad & Banking Company of Georgia, prayed for an order turning over to them all property in the hands of the receivers, which petition, with minor exceptions, was granted.

Very soon after the litigation began, reorganization was contemplated, and was worked for by the bondholders and other parties to the litigation. The bill of the Central Railroad & Banking Company of Georgia against the Farmers' Loan & Trust Company, filed July 4, 1892, under which the receiver was appointed, asked for reorganization under the protection of the court. On October 17, 1892, and on December 10 and 17, 1892, the receiver filed petitions asking for authority to take certain steps in the interest of reorganization. These petitions were granted, and about $20,000 were paid by the receivers for expenses thus caused. In January, 1893, various other petitions were filed by the receiver to effect reorganization, and, under orders of court, contracts were made with the Hollins syndicate for reorganization. The Hollins plan failed, and a new scheme was devised, in which the reorganizers were bond, stock, and debenture holders of the Central Railroad & Banking Company of Georgia, under which all properties of the said company were to be sold as follows: (1) All of the properties of the Central Railroad & Banking Company of Georgia covered by mortgage were to be sold under foreclosure of mortgage to the Central Trust Company, as trustee, to secure the $13,000,000 consolidated bonds. This foreclosure was to be accomplished by the cross bill of the Central Trust Company. (2) The collateral securing the floating debt and bills payable of the Central Railroad & Banking Company of Georgia, and its receivers, were to be sold to the reorganizing purchasers under

93 F.—56

order of court. (3) The collateral bonds were for the present to remain outstanding, secured by the collateral pledged to protect them, consisting of bonds and stocks. All other property of the Central Railroad & Banking Company of Georgia not covered by the foregoing mortgages and pledge, including the cash in the receivers' hands, was to be sold, under order of court, to the reorganizing purchasers. This property was afterwards termed the "overflow property." This reorganization plan further provided that upon the foreclosure of the mortgages and the purchase of the property the purchaser would organize a new corporation, to be called "The Central of Georgia Railway Company," which was to be vested with the title to the railroads and properties covered by such mortgages and pledge, and that such new corporation should issue to the purchasers securities as follows: $7,000,000 first mortgage 50-year gold bonds, bearing 5 per cent. interest; $16,500,000 consolidated 50-year gold bonds, bearing 5 per cent. interest; $3,500,000 first preference income bonds; $6,500,000 second preference income bonds; $4,000,000 third preference income bonds; $5,000,000 full-paid common stock,—and that said securities were to be distributed to the security holders as in said agreement prescribed. particularly providing for certain common stock holders, known in the litigation as the "minority stockholders," as follows: "The purchasers agree to take up and exchange so much of the 32,800 shares of present stock of the Central Railroad & Banking Company of Georgia owned by the public, when and as such stock is deposited in the Mercantile Trust Company of New York for such purpose, at the rate of par for the third preference income bonds of the new company." The record shows that this reorganization plan was fully carried through. Thomas and Ryan acted as agents for the reorganization syndicate, and, having purchased all the property and obtained all the assets of the Central Railroad & Banking Company of Georgia, turned the same over to the new Central of Georgia Railroad Company, which issued the new securities in accordance with the reorganization scheme. No provision appears to have been made in the reorganization agreement for the distribution of the full-paid common stock to be issued by the new company; but from matters appearing in the record, and not disputed, the majority stock of the Central Railroad & Banking Company of Georgia, to wit, 42,000 shares formerly held by the Richmond-West Point Terminal Railway Company, were exchanged for the entire capital stock of $5,000,000 of the new company. Thus it appears that one result of the proceedings in foreclosure and liquidation was that the entire stock of the Central Railroad & Banking Company of Georgia was recognized, and allowed to participate in the reorganization, and the holders of such stock retained a certain large and valuable interest in the newly-organized company. The record further shows that the new Central of Georgia Railway Company (the reorganization itself) filed its petition in December, 1896, praying that it be substituted as defendant in the place and stead of Thomas and Ryan, and that a decree be rendered vesting them with all the assets of the defendant corporations and their receivers. which petition was granted, saving only that Thomas and Ryan were not discharged as parties, nor relieved from an accounting for the assets received by them from the receivers.

In the litigation, the history of which is hereinbefore partly recited, Mary F. Paul intervened on the 31st day of January, 1896, claiming that she was entitled to dividends on stock of the Southwestern Railroad Company which had been accruing during a period of time 20 years previous to the receivership of the Central Railroad; that the said dividends so due to her constituted a trust fund, which prior to the 4th of March, 1892, was held by the Central Railroad, and since that time by its receivers; and that she had an equitable lien upon the property and assets of the Central Railroad, which was superior to that of all other persons. One share of the stock of the Southwestern Railroad upon which she claimed a dividend stands on the books of the Southwestern Railroad Company in the name of John Richardson, trustee of J. S. Caruthers and wife, and the other ten shares stand on the books of the company in the name of J. Richardson, executor; and she has brought suit against the Southwestern Railroad Company to compel that company to issue to her, individually, a scrip for said stock, to which she is legally entitled, and the said suit is now pending and undetermined in the

superior court of Bibb county, Ga. In 1869 the Southwestern Railroad Company leased its railroad and appurtenances to the Central Railroad & Banking Company of Georgia, and part of the consideration of said lease is the following: "And the said Central Railroad and Banking Company of Georgia hereby covenants and agrees to and with the said Southwestern Railroad Company, that, during the months of June and December in every year during the continuance of the term hereby granted, it will declare and pay to the stockholders of the said Southwestern Railroad Company dividends which shall bear to the dividends declared and paid to its own stockholders the ratio of eight to ten (that is to say, $8 to each share of Southwestern Railroad stock to every $10 declared and paid to each share of its own stock), and that no semiannual dividend so declared and paid to the stockholders of the Southwestern Railroad Company shall be less than at the rate of seven per centum per annum on the par value of their stock, and that whenever any stock dividend, or division of assets or accumulation shall be declared, paid, or made to the stockholders of the said Central Railroad and Banking Company of Georgia, a similar dividend for the distribution shall be paid and made to the stockholders of the Southwestern Railroad in the same proportion of eight to ten, and that all said dividends and distributions of every sort shall be paid to the stockholders of the Southwestern Railroad Company at Macon and Savannah, as the said company has heretofore paid its dividends, and be free of all taxes to the stockholders." It seems to be admitted that the said Mary F. Paul is the owner of said 11 shares of stock; but it appears that she has not yet been registered upon the books of the Southwestern Railroad Company as a stockholder. Her suit to compel the issue of the scrip to her is pending and undetermined. The defendant admitted that the amount of dividends is correctly stated in the intervention, but denied that the dividends were ever held as a trust fund, and set up the fact that there had never been any specific appropriation of money to pay the dividends due the Southwestern Railroad stockholders, and denied that the intervener had any equitable lien. It contended that she was merely a general creditor, without equitable lien, and not entitled to a preference. The master, to whom the cause was referred, found that the intervention was prematurely filed, upon the ground that the intervener, not having become a registered stockholder of the Southwestern Railroad Company, was not in a position to demand dividends previously declared upon the stock. The court set aside the master's report, and rendered a decree for the sum of $1,640.50 in favor of the intervener, and put its decree upon the ground that the receiver having been ordered on March 7, 1892, to pay in full any depositors who had money on deposit in the banking department of the Central Railroad & Banking Company of Georgia, the claim of this intervener being in the nature of a deposit in said banking department, her claim was properly within the scope of that order and should be paid. From this order the Central of Georgia Railway Company sued out this appeal, assigning errors as follows: "(1) The Central of Georgia Railway Company is not liable, under the order substituting it as defendant in this case, for any debts of the Central Railroad & Banking Company of Georgia, except such as are of a preferential nature, and this debt is not of this kind. (2) The claim of the intervener is an unsecured claim not entitled to a legal lien or equitable preference. (3) The Central Railroad & Banking Company of Georgia did not hold the dividends due the intervener as a trust fund, there being no specific appropriation of money to the payment of dividends. (4) The Central Railroad & Banking Company of Georgia did not hold the money due to the intervener as a deposit in its banking department. (5) The order of this court dated March 7, 1892, wherein the receivers were ordered to pay in full any depositors who had money on deposit in the banking department of the Central Railroad & Banking Company of Georgia, and which is referred to in the decree, is not applicable to the claim of this intervener, and, in addition, said order was passed at a time when the Central Railroad & Banking Company of Georgia was not alleged to be or found to be insolvent. (6) There is nothing in the nature of the claim itself which would entitle it to an equitable preference over any other creditor in this cause. (7) If the court decides that intervener's claim is entitled to priority, the decree ought to provide that it should not be paid until she becomes a registered stockholder."

T. M. Cunningham, Jr. for appellant.
W. L. Clay, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

After reciting the foregoing, the opinion of the court was delivered by PARDEE, Circuit Judge.

There is no substantial dispute that the appellee, Mary F. Paul, was and is a creditor of the Central Railroad & Banking Company of Georgia, and the question is whether the Central of Georgia Railway Company is liable for her demand. The case shows that the sale of the railway properties under the foreclosure at the suit of the Central Trust Company, the sale of the collateral securing the floating debt claims, and the sale of the "overflow property," all were in pursuance of a reorganization plan, which was carried out, and resulted in the transfer of all the property and assets of the Central Railroad & Banking Company of Georgia to the Central of Georgia Railway Company; and the active participating reorganizers were not only the creditors of the Central Railroad & Banking Company of Georgia, secured by mortgage and otherwise, but included as well the stockholders of said company; so that, for the purposes of the present case, it is an indisputable fact that, notwithstanding all the sales of property and other transactions in liquidation, the stockholders of the Central Railroad & Banking Company of Georgia retained their interest and rights, and by virtue thereof are now either stockholders of the new reorganization, Central of Georgia Railway Company, or are otherwise provided for, and that the new company has acquired, and now holds, all the former property and assets of the old company. It would seem from this state of facts that the appellee has the right to look to the new company for the payment of her claim. Railroad Co. v. Howard, 7 Wall. 392, is directly in point. As epitomized in the syllabus, it is as follows:

"A sale under foreclosure of mortgage on an insolvent railroad company, expedited and made advantageous by an arrangement between the mortgagees and the stockholders, under which arrangement the mortgagees, according to their order, got more or less of their debt (100 to 30 per cent.), and the stockholders of the company the residue of the proceeds, a fraction (16 per cent.) of the par of their stock, held fraudulent as against general creditors not secured by the mortgage; and this although the road was mortgaged far above its value, and on a sale in open market did not bring near enough to pay even the mortgage debts, so that in fact, if there had been an ordinary foreclosure, and one independent of all arrangement between the mortgagees and the stockholders, the whole proceeds of sale would have belonged to the mortgagees."

In other adjudged cases we find principles declared as follows:

"Equity regards the capital stock and property of a corporation as held in trust for the payment of the debts of the corporation, and recognizes the right of creditors to pursue such properties into whosesoever possession the same may be transferred, unless the stock or property has passed into the hands of a bona fide purchaser; and the rule is well settled that stockholders are not entitled to any share of the capital stock, nor to any dividend of the profits, until all the debts of the corporation are paid." Scammon v. Kimball, 92 U. S. 362, 367. "The property of a corporation is doubtless a trust fund for the payment of its debts, in the sense that when the corporation is lawfully dissolved, and all its business wound up, or when it is insolvent, all its creditors

are entitled, in equity, to have their debts paid out of the corporate property before any distribution thereof among the stockholders. It is also true in the case of a corporation, as in that of a natural person, that any conveyance of property of the debtor, without authority of law, and in fraud of existing creditors, is void as against them. Story, Eq. Jur. § 1252; Curran v. Arkansas, 15 How. 304; Graham v. Railroad Co., 102 U. S. 148, 161; Railroad Co. v. Howard, 7 Wall. 392; Goodin v. Canal Co., 18 Ohio St. 169." Railway Co. v. Ham, 114 U. S. 587, 594, 5 Sup. Ct. 1081. "Any device by which the assets of an insolvent corporation are to be parceled out between shareholders, leaving creditors unpaid, is a fraud of which creditors affected may complain. That such creditors may follow the purchase money thus wrongfully paid into the hands of stockholders is very clear. That shareholders have only a right to the surplus after all debts are paid is familiar law." Railroad Co. v. Evans, 14 C. C. A. 116, 128, 66 Fed. 822.

In one of the many orders issued by the court in the liquidation proceedings was an invitation to the general creditors of the Central Railroad & Banking Company of Georgia to intervene and assert their claims against the funds derived from the sale of the "overflow property," in pursuance of which the present appellee intervened, asserting her claim. To recover the entire amount of her demand from the new company, on the view herein presented, she might have been driven to a bill in equity; but as there has been a full hearing in the present proceeding, and the appellant has been permitted to make a full defense, and as the decree appealed from does full equity between the parties, it may well be affirmed without further pleading. Taking this view of the case, it is unnecessary to consider whether there is any trust or other fund still under control of the court out of which appellee can be paid, or whether the appellee's claim is entitled to consideration as one in which a special or general deposit to her credit was made in the banking department of the Central Railroad & Banking Company of Georgia. The decree appealed from is affirmed.